711 S.E.2d 912

**Albert EPSTEIN, Appellant,**

v.

**COASTAL TIMBER CO., INC., Respondent.**

No. 26997.

Supreme Court of South Carolina.

Heard June 9, 2011.
Decided July 11, 2011.

Darrell Thomas Johnson, Jr. and Mills L. Morrison, Jr., both of The Law Offices of Darrell Thomas Johnson, Jr., L.L.C., of Hardeeville, for Appellant.

Philip C. Thompson, of Thompson & Henry, P.A., of Conway, for Respondent.

Justice BEATTY.

Albert Epstein ("Epstein") brought this action for damages against Coastal Timber Co., Inc. ("Coastal"), alleging Coastal cut and removed standing timber that was subject to mortgages he held on the property. The circuit court found Epstein failed to properly secure an interest in the timber under South Carolina's Uniform Commercial Code ("UCC"). Epstein appeals. We reverse and remand.

## I. FACTS

In March 2004, Epstein purchased real property in Horry County from TMAC Investors IX, L.L.C. for $130,000.00. The deed was recorded on April 19, 2004. The area, known as the old Conway Mill site, included just under 120 acres of land and a building of 294,080 square feet.

In May 2006, Epstein sold the property to Ascott Valley Development, L.L.C. for a purchase price of $3.3 million. Ascott was formed by Wynn Housel and Howard B. Schwartz, who intended to develop the property for a residential neighborhood. Their plans were to divide the acreage into two sections according to use: (1) the building and the 45 acres on which it stood would be used to manufacture homes, and (2) the homes would be placed on the remaining wooded portion of the property that measured a little over 70 acres.

As part of the sales arrangement, Epstein provided 100% owner financing. Ascott executed two mortgages and two notes in favor of Epstein, using the property as collateral. The deed and mortgages were signed on May 25, 2006 and filed on June 1, 2006. According to Epstein, he took two mortgages to better secure Ascott's obligations—$2.0 million note secured with a mortgage on the 45 acres, and a $1.3 million note secured by a mortgage on the remaining 70–plus acres. The sum of the two mortgages on the property thus equaled the $3.3 million purchase price.

On June 6, 2006, Ascott executed a "Timber Title" conveying to Coastal for $115,000.00 all merchantable pine timber and all merchantable hardwood of 14 inches "across stump or larger" located on the property. The document called for the timber to be removed within twelve months. Coastal, the purchaser, recorded the Timber Title documenting the sale on June 12, 2006 in the Office of the Horry County Register of Deeds. Coastal thereafter cut and removed the timber and paid Ascott the full proceeds.

Ascott subsequently defaulted on its obligations to Epstein, who brought foreclosure proceedings. During this process, Epstein learned of the removal of the timber.

On April 22, 2009, while the foreclosure against Ascott was still pending,[1] Epstein filed the current action against Coastal,

---

1. The foreclosure action against Ascott was eventually resolved by Epstein obtaining a deficiency judgment against Ascott for $305,000.00.

alleging the timber was cut without his knowledge or permission and that he had received no portion of the proceeds. Epstein asserted his recorded mortgages constituted notice to all parties that he had a lien upon timber on the property, and that his lien was "superior in priority" to the Timber Title and had not been released or waived. Epstein sought damages for the actual value of the timber removed and the diminution of the property's fair market value caused by the removal of timber. He also sought clean-up costs, treble damages, post-judgment interest, and "further relief as may be just and proper."

Coastal answered and denied liability, asserting Ascott was the owner of the property, that it had paid Ascott for the full value of the timber cut, and there was no agreement between Coastal and Ascott that would permit it to withhold the sales proceeds from Ascott. Coastal also stated Epstein had "assumed the risk that timber on the subject property would be cut and sold when he failed to properly secure the timber as collateral, either through the form of his mortgage or through the use of a security agreement and financing statement."

Coastal thereafter moved for summary judgment, asserting South Carolina's UCC now provides that a contract for the sale of standing timber is a sale of goods, not realty, and that Epstein's two mortgages do not cover the timber because they do not meet UCC requirements for creating a security interest. Specifically, the mortgages do not provide a description of the collateral as being standing timber or timber to be cut.

Epstein moved for partial summary judgment, arguing the timber was encumbered by his mortgages because the timber was not expressly excluded. Epstein argued, "It is black letter law that standing timber is a part of real property until it is severed."

The circuit court granted Coastal's motion for summary judgment and denied Epstein's motion. The circuit court found the UCC was controlling and that Epstein's mortgages did not meet the requirements to maintain a security interest

---

Coastal alludes to the possibility of a double recovery, but there is nothing in the record to establish whether Epstein actually recovered on the judgment; further, any allegation in this regard is best considered by a trial court in the first instance.

in the timber under the UCC. Epstein made a Rule 59(e), SCRCP motion, which was denied.

Epstein appealed to the Court of Appeals. This Court issued an order certifying the case for its review pursuant to Rule 204(b), SCACR.

## II. STANDARD OF REVIEW

A trial court may grant a party's motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP.

In determining whether any triable issues of fact exist, the trial court must view the evidence and all reasonable inferences that may be drawn therefrom in the light most favorable to the party opposing the motion. *Hooper v. Ebenezer Senior Servs. & Rehab. Ctr.*, 386 S.C. 108, 687 S.E.2d 29 (2009). An appellate court applies the same standard used by the trial court under Rule 56(c) when reviewing the grant of a motion for summary judgment. *Id.*

## III. LAW/ANALYSIS

On appeal, Epstein argues the circuit court erred in granting summary judgment to Coastal after finding his mortgages did not constitute a lien on the standing timber cut by Coastal.

In South Carolina, standing timber has historically been defined as "a part of the realty, as much so as the soil itself." *First Carolinas Joint Stock Land Bank of Columbia v. N.Y. Title & Mortgage Co.*, 172 S.C. 446, 450, 174 S.E. 406, 408 (1934) (citation omitted); *see also D.W. Alderman & Sons Co. v. Kirven*, 209 S.C. 446, 455, 40 S.E.2d 791, 794 (1946) ("We have held . . . that trees growing upon lands are a part of the realty, and continue to be realty until severed from the soil."). "The conveyance of timber land without reservation or exception of timber carries the timber." *First Carolinas*, 172 S.C. at 450, 174 S.E. at 408 (citation omitted).

The mortgagor of land is the owner in fee and has title to the land so mortgaged, but the mortgagee has a lien upon the land to secure his debt. *Simms v. Kearse*, 42 S.C. 43, 20 S.E. 19 (1894); *see also* S.C.Code Ann. § 29–3–10 (2007) (stating "the mortgagor shall be deemed the owner of the land and the mortgagee as owner of the money lent or due"). A mortgage on real property includes the standing timber unless it has been excepted from the mortgage. *See First Carolinas*, 172 S.C. at 450, 174 S.E. at 407–08 ("Growing timber constitutes a portion of the realty embraced by a mortgage on the land unless expressly or impliedly excepted." (citation omitted)); *see also* 59 C.J.S. *Mortgages* § 236 (2009) ("As a general rule, crops, timber, and nursery stock growing on mortgaged land are covered by the mortgage unless expressly or impliedly excepted therefrom.").

The circuit court, while recognizing these general principles, found the South Carolina cases classifying timber as realty predated the 1988 amendment to section 36–2–107 in the UCC, particularly subsection (2), which the court found "transformed timber from realty to goods." Section 36–2–107 provides in full as follows:

### § 36–2–107. Goods to be severed from realty; recording.

(1) A contract for the sale of minerals or the like (including oil and gas) or a structure or its materials to be removed from realty is a contract for the sale of goods within this chapter if they are to be severed by the seller, but until severance, a purported present sale, which is not effective as a transfer of an interest in land, is effective only as a contract to sell.

(2) *A contract for the sale apart from the land* of growing crops or other things attached to realty and capable of severance without material harm thereto but not described in subsection (1) or *of timber to be cut is a contract for the sale of goods* within this chapter whether the subject matter is to be severed by the buyer or by the seller *even though it forms part of the realty at the time of contracting, and the parties can by identification effect a present sale before severance.*

(3) The provisions of this section are subject to any third-party rights provided by the law relating to realty records, and the contract for sale may be executed and recorded as a document transferring an interest in land and shall then constitute notice to third parties of the buyer's rights under the contract for sale.

S.C.Code Ann. § 36–2–107 (2003) (emphasis added). The South Carolina Reporter's Comments following section 36–2–107 explain the purpose for the 1988 revision of the statute was to facilitate the financing of timber transactions and to provide a method for noticing the sale in the real estate records:

Several timber-growing states changed the 1962 Text to make *timber to be cut under a contract of severance qualify as goods*, regardless of the question who is to sever them. The section is revised to adopt this change. *Financing of the transaction is facilitated* if the timber is treated as goods instead of real estate. A similar change is made in the definition of "goods" in Section 9–105 of the 1988 UCC Amendments. *To protect persons dealing with timberlands, filing on timber to be cut is required ... to be made in real estate records in a manner comparable to fixture filing.*

S.C. Reporter's Comments to section 36–2–107, Note to 1988 Amendment (emphasis added).

The circuit court concluded "the 1988 amendment to South Carolina's Uniform Commercial Code converted standing timber from real property to personal property and requires that it be treated as a sale of goods and secured as such." The circuit court stated additional support for this conclusion is found in the definition of "goods" in section 36–9–102. This section provides in relevant part: "The term [goods] includes ... standing timber that is to be cut and removed under a conveyance or contract for sale...." S.C.Code Ann. § 36–9–102(a)(44) (2003).

The circuit court further observed that to be valid and enforceable, section 36–9–203 of the UCC requires a security interest in timber to be cut under a contract of sale to be evidenced by a security agreement that is authenticated and contains a description of the collateral. *See id.* § 36–9–

203(b)(1), (2) & (3)(A) (stating a security interest is enforceable only if (1) "value has been given," (2) "the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party," and (3) "the debtor has authenticated a security agreement that provides a description of the collateral and, *if the security interest covers timber to be cut,* a description of the land concerned" (emphasis added)).

In addition, the circuit court noted that section 36–9–502 of the UCC "provides two methods by which a security interest in timber can be perfected[;] one is by filing a financing statement that specifies that the collateral covered is timber and the other is by filing [ ] a Mortgage that meets the requirements of [a] financing statement and specifies the goods that it covers." *See id.* § 36–9–502 (setting forth UCC requirements for financing statements covering goods).

The circuit court found none of the documents submitted to the court included a financing statement, and Epstein's mortgages contained no language specifically identifying the timber. Therefore, the mortgages on the property did not secure Epstein's interest in the timber since they did not meet the UCC requirements. The circuit court stated although Epstein did present case law identifying timber as realty, all of the cases predated the 1988 amendment to the UCC. For these reasons, the circuit court granted Coastal's motion for summary judgment.

Epstein filed a Rule 59 motion, asserting the circuit court had misinterpreted the UCC provisions. Epstein argued the provisions cited by the circuit court identifying timber as "goods" all refer to standing timber to be cut under a contract of sale and that the UCC did not convert all standing timber into "goods." Since standing timber remains real estate, it is subject to being encumbered by a mortgage. He maintained the Reporter's Comments to section 36–2–107 state the main purpose of the 1988 amendment is to facilitate the financing of timber to be cut under a contract of sale. Epstein's Rule 59 motion was denied. On appeal, Epstein asks this Court to reverse the order granting summary judgment to Coastal on the basis his mortgage on the real property included the timber.

 "The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature." *Media Gen. Commc'ns, Inc. v. S.C. Dep't of Revenue*, 388 S.C. 138, 147–48, 694 S.E.2d 525, 529 (2010) (quoting *Charleston County Sch. Dist. v. State Budget & Control Bd.*, 313 S.C. 1, 5, 437 S.E.2d 6, 8 (1993)): "The determination of legislative intent is a matter of law." *Id.* (citation omitted). Where a statute's language is plain and unambiguous and conveys a clear and definite meaning, the court has no right to impose another meaning. *Id.* at 148, 694 S.E.2d at 530.

 Statutes in derogation of the common law are strictly construed. *Standard v. Shine*, 278 S.C. 337, 295 S.E.2d 786 (1982); *Major v. Nat'l Indem. Co.*, 267 S.C. 517, 229 S.E.2d 849 (1976). "Where no conflict with common law exists, however, this Court will not substitute its view of public policy for that of the legislature." *Standard*, 278 S.C. at 340, 295 S.E.2d at 788.

 Statutory language must be read in a sense that harmonizes with its subject matter and accords with its general purpose. *Cox v. BellSouth Telecomms.*, 356 S.C. 468, 589 S.E.2d 766 (Ct.App.2003). Words in a statute must be given their plain and ordinary meaning without resorting to subtle or forced construction to limit or expand the statute's application. *Id.*

 The parties point to no South Carolina case examining the relationship between these UCC statutory provisions and existing real estate law. However, we conclude the UCC can be read in harmony with the common law so as to give full effect to each.

We find the UCC provisions recited by the circuit court[2] pertain specifically to *timber to be cut under a contract of sale*. The purpose of the UCC amendment was, as noted above, to facilitate the financing of a transaction to purchase timber by treating timber to be cut under a contract of sale as

---

**2.** Sections 36–2–107(2) (recording contracts for the sale of goods to be severed from realty, including contracts for the sale of timber to be cut), 36–9–102(a)(44) (defining "goods" to include timber to be cut under a contract of sale), 36–9–203 (security interests in timber to be cut and as-extracted collateral), 36–9–502 (financing statements for timber to be cut and as-extracted collateral).

a sale of goods, even though the timber is still attached to the land, and to provide a method for a purchaser to document a security interest in such timber under contract. The UCC requires a party to include a specific description of the collateral and the real property in this instance in order to identify the timber under contract and provide adequate notice to other parties of the declared interest.

We agree with Epstein that section 36–2–107(2) did not convert all standing timber to goods and thereby divest him of his interest in the timber. This section and the related UCC provisions do not cancel the effect of a mortgage or lien on timber that is already recorded in the real estate records. Rather, any security interest later recorded on timber to be cut under a contract of sale would be junior to any existing interests. To hold otherwise would allow a mortgagor to unilaterally void an existing lien imposed by a mortgage on the real property, which includes the timber, simply by thereafter executing a contract to sell the timber.

Support for this interpretation is found in section 36–2–107 of the UCC itself, which states in subsection (3): "The provisions of this section [36–2–107] are subject to any third-party rights provided by the law relating to realty records...." S.C.Code Ann. § 36–2–107(3). Thus, on its face, the UCC expressly recognizes the need to harmonize with existing real estate records, such as interests in the property that have already been recorded.

Epstein's mortgage was sufficient under the common law to secure a lien on the property, including the timber, and he was not required to satisfy the UCC requirements as found by the circuit court. Those requirements were relevant only to those seeking to secure their interest in the timber to be cut under a contract of sale, and such interests would be subject to Epstein's previously-recorded interest.

In a similar case, *Feliciana Bank & Trust v. Manuel & Sessions, L.L.C.,* 943 So.2d 736 (Miss.Ct.App.2006), the plaintiff, a bank, brought an action for damages after standing timber was sold and removed from land on which it held a deed of trust.[3] *Id.* at 737. The Court of Appeals of Mississip-

---

3. "A deed of trust is a security interest in property, similar to a mortgage." *Manios v. Nelson, Mullins, Riley & Scarborough, L.L.P.,*

pi reversed the grant of summary judgment to the defendant and found the plaintiff's deed of trust was sufficient to provide a security interest in the timber. *Id.* at 739. The court rejected the defendant's argument that no perfected security interest existed because the plaintiff did not make a filing in accordance with the UCC, which now recognizes contracts for the sale of timber to be cut as a sale of goods. *Id.* at 738–39.

In evaluating the effect of the UCC changes in timber to be cut relative to the common law pertaining to real property, the court "conclude[d] that the proper analysis is not one of cancellation but of priority." *Id.* at 740. The court held the bank had a security interest in the timber and the rights of any subsequent purchasers of the timber were subordinate to the bank's interest. *Id.* The court noted that "[t]he bank's failure to perfect its interests under the UCC was irrelevant to its right to remain secure." *Id.*

In reaching this result, the court explained that the changes in the UCC did not displace the common law regarding securing interests in timber:

> *The trial court in essence concluded that the Mississippi commercial code displaced the common law on the securing of interests on timber.* Under that view, either a deed of trust no longer applies to timber at all, or the security is lost as soon as a conveyance or contract for sale of timber occurs. The legislature has certainly defined standing timber as personal property upon the execution of a contract for its cutting. Someone involved in that cutting may make a UCC filing to secure the interest that has been obtained. *Prior to such a contract, though, the UCC does not cause timber to be classified as "goods."* Absent any statutory forcing of a change in the common law, the timber prior to a contract for its cutting would remain real property. The UCC does not purport to cancel the reach of a pre-existing deed of trust which at least would secure timber that is not subject to a contract for harvesting. Consequently, the most the UCC would have done is cancel the lien of a deed of trust as soon as a contract for a timber sale occurs. If

---

389 S.C. 126, 132 n. 1, 697 S.E.2d 644, 647 n. 1 (Ct.App.2010) (citing *Black's Law Dictionary* 414 (6th ed.1990) (defining a deed of trust)).

cancellation is the result of the Code, there would be no lasting security over timber created by a deed of trust.

*We conclude that the proper analysis is not one of cancellation but of priority.* Historically, a deed of trust granted a security interest in all property that was part of the realty. Under the UCC, though, if a typical deed of trust is executed after a contract for the cutting of the timber has been executed but before the actual harvesting of the trees, the deed of trust will either not apply to the timber at all because the timber is now personalty, or else the deed of trust will be subordinate to a prior UCC filing. *Conversely, if the deed of trust predates any contract to cut the timber, the security interest vests in timber and cannot be divested simply by a contract for sale.* Again, the matter is one of priority.... [T]he previously quoted section on sales relating to timber recognizes the continuing effect of real property rules when it states that timber sales under the UCC "are subject to any third party rights provided by law relating to realty records...." Miss.Code Ann. § 75–2–107(3).

*Id.* at 739–40 (emphasis added).

We find the reasoning in the *Feliciana Bank* case is sound. Based on the foregoing, we hold the circuit court erred in finding Epstein was divested of his security interest in the timber based on the UCC. The UCC changes did not effect a wholesale cancellation of existing real estate law in South Carolina and did not convert all standing timber to "goods." At the time Epstein's mortgages were executed and recorded, they secured his interest in the real property, including the standing timber, and this interest vested before there ever was a contract to cut the timber. Thus, Epstein's mortgages secured a lien on the property as well as the timber and any subsequent interests are subordinate. This result is not in conflict with, but in harmony with, the UCC provisions.

## IV. CONCLUSION

We hold the circuit court erred in finding Epstein's mortgages were insufficient to secure a lien on the timber for the subject property and that he was required to meet the UCC requirements. The UCC requirements pertain to securing an

interest in timber to be cut under a contract of sale, and these interests are subject to liens already noticed in the real estate records. Consequently, we reverse the circuit court's order granting summary judgment to Coastal and remand the matter for further proceedings.[4]

**REVERSED AND REMANDED.**

TOAL, C.J., PLEICONES, KITTREDGE and HEARN, JJ., concur.

---

4. We decline to address the additional sustaining ground Coastal raises in its brief. Further, Coastal also challenges certain material listed in Epstein's Designation of Matter that was included in the record—a two-page excerpt from Tommy Grainger's deposition. There is no indication Coastal interposed a timely objection by filing a motion to strike at the time the material was designated for inclusion in the record. Moreover, Coastal has shown no prejudice. The few factual details included in the excerpt (that Grainger was the owner of Coastal and had bid on the timber) were not in dispute and had no bearing on the outcome of this case, in any event.